IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| BRIAN KEITH TERRELL, | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. _____ |
| | ) | |
| HOMER BRYSON, Commissioner, | ) | |
|     Georgia Department of Corrections; | ) | EXECUTION SCHEDULED |
| | ) | **Tuesday, December 8, 2015,** |
| | ) | **7:00 P.M.** |
| BRUCE CHATMAN, Warden, | ) | |
|     Georgia Diagnostic and Classification | ) | |
|     Prison; | ) | |
| | ) | |
| OTHER UNKNOWN EMPLOYEES | ) | |
| AND AGENTS, | ) | |
| | ) | |
|     Georgia Department of Corrections, | ) | |
| | ) | |
|     Defendants. | ) | |
| | ) | |
| _____ | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S COMPLAINT**

Defendants intend to execute Plaintiff Brian Keith Terrell on Tuesday

evening with compounded lethal injection drugs obtained from the same

pharmacist who mixed the defective drugs that congealed into clumps on the night

of March 2, 2015, and resulted in the postponement of his first scheduled

execution.  In this Court, Defendants attributed those botched drugs to an "isolated

mishap." But documents recently disclosed by Defendants demonstrate that it was not merely one but *two* separate batches of lethal injection drugs – mixed one week apart – that coagulated and became unusable. These documents also establish that after a self-investigation largely concealed by Georgia's lethal injection secrecy act, Defendants *still* do not know why their drugs were too dangerous to use. That uncertainty, however, has not deterred Defendants from using drugs from the same source to carry out two executions, which featured such a wide disparity in how long the prisoners survived after being injected that it suggests the efficacy of the drugs varies widely from batch to batch.

These documents, which have never been considered by any court, establish three things: that Defendants' problems with their lethal injection were more widespread than they admitted; that Defendants still have not solved those problems; and that Defendants' problems are continuing. This Court has dismissed previous litigation concerning Defendants' use of secretly-sourced compounded pentobarbital in lethal injections because it concluded that -- in the absence of the information withheld by Defendants concerning the origin and true nature of the drugs -- the prisoners' allegations of a substantial risk of significant harm were speculation.[1] In the instant case, there is no speculation. Documents recently

---

[1] *Wellons v. Owens*, Case No. 1:14-CV-1827-WBH; *Gissendaner v. Bryson*, Case No. 1:15-CV-523 ("*Gissendaner I*"); *Gissendaner v. Bryson*, Case No. 1:15-CV-689 ("*Gissendaner II*").

disclosed by Defendants demonstrate that fifty percent of the batches of drugs that their pharmacist has mixed for use in executions have crystallized, while the other two batches have yielded widely divergent results.  In contrast to the plaintiffs in *Wellons* and *Gissendaner*, *see* note 1, *supra*, Mr. Terrell has *evidence* of an unconstitutional risk.  "It is certainly fair to infer that if there is a problem with the supply of defective compounded pentobarbital . . . and Georgia has not been able to figure out what caused that problem, the problem is likely to recur." *Gissendaner v. Bryson*, 803 F.3d 565, 579 (Jordan, J., dissenting). As Defendants' conduct presents an imminent and substantial risk of serious harm to Mr. Terrell in violation of his rights pursuant to the Eighth and Fourteenth Amendments to the United States Constitution, he respectfully petitions this Court to enjoin his execution.

## FACTS SUPPORTING THE COMPLAINT

### I.    The Events of March 2, 2015

On March 2, 2015, both Brian Terrell and Kelly Gissendaner were scheduled for execution pursuant to Defendants' one-drug lethal injection protocol[2], which features a substance that purports to be "Pentobarbital," but that has been mixed from unknown ingredients and in unknown circumstances by a compounding pharmacist whose identity is concealed pursuant to Georgia's lethal injection

---

[2] *See* Defendants' Lethal Injection Procedures of July 17, 2012 ("Ex. 23").

3

secrecy act.[3]  Ms. Gissendaner was scheduled for execution at 7:00 p.m. that evening, while Mr. Terrell's execution date was eight days later, on March 10, 2015.

At 10:19 p.m. on March 2, however, Ms. Gissendaner's lawyers were notified that her execution would not proceed that evening because Defendants' compounded lethal injection drugs were defective. Declaration of Lindsay N. Bennett (Attached as "Ex. 2") at ¶2.  Defendants' counsel reported that the lethal injection drugs had initially appeared "fine," but that at around 9:00 p.m. they "appeared" cloudy.  *Id.*[4]  At approximately 10:29 p.m., Defendants' counsel called back to report that Ms. Gissendaner's execution might proceed because "there was a batch [of lethal injection drugs] *from the prior week* and a batch from '*this week*'" that "might be available to use."  Ex. 2 at ¶6 (emphasis added).[5]  At 10:43

---

[3]*See* O.C.G.A. § 42-5-36 and discussion *infra* at 27.

[4]Defendants later released "a video of one syringe of the pentobarbital sodium solution that was prepared for use at the scheduled execution of Inmate Gissendaner." Affidavit of Robert Jones of 04/16/2015 ("Ex. 3") at ¶2; *see also* Video of Precipitated Lethal Injection Drug ("Ex. 4").  That video shows a solution that has congealed into large clumps which, as the syringe is rotated, sink and crash into the plunger.

[5]As discussed *infra*, the Controlled Chemical Inventory Log disclosed by Defendants in response to Mr. Terrell's ORA request indeed reflects the receipt of two "batches" of lethal injection drugs within the weeks prior to Ms. Gissendaner's execution.  See Ex. 5.  Accordingly, the fact that Defendants' counsel stated that two batches had been checked is significant.

p.m., Defendants' counsel telephoned again and stated that the execution would be postponed, as both the physician attending the execution and a pharmacist had "reported to [Defendants] that they did not think the drugs would be 'appropriate for medical use.' *Id.* Defendants' counsel insisted that there were no problems with their supplier; "*this* batch [of drugs] just did not come out like it was supposed to."[6] Ex. 2 at ¶ 7 (emphasis added).

On March 3, Defendants reported that the executions of Ms. Gissendaner and Mr. Terrell would be postponed indefinitely "while an analysis is conducted of the drugs planned for use in last night's scheduled execution . . . ." *See* Press Release, "*Court Ordered Executions Postponed - Kelly Renee Gissendaner and Brian Keith Terrell*," Georgia Department of Corrections, March 3, 2015 ("Ex. 1"). Defendants initially provided few details of the steps of its investigation, saying only that they might send the drugs to be analyzed by the same pharmacist who had provided them, or perhaps to "an independent lab."  Affidavit of Robert Jones of 03/19/2015 ("Ex. 6").

---

[6] This assertion seems questionable in light of General Counsel Jones's admission, discussed *infra*, that the "backup supply," which was likely a separate batch of pentobarbital altogether, also crystallized.

## II.    Defendants' Subsequent Disclosures

Following the dismissal of a Section 1983 action filed by Ms. Gissendaner in the United States District Court for the Northern District of Georgia, Defendants resumed executions with the same source of drugs and the same protocol as in March.  Defendants executed Ms. Gissendaner on September 30, 2015.  They executed Marcus Ray Johnson on November 19, 2015.

In Ms. Gissendaner's action, however, Defendants filed a number of submissions about their subsequent investigation which establish that Defendants *still* do not know why their lethal injection drugs were defective.[7]  Further, Defendants' recent disclosure of their Controlled Chemical Inventory Log and the reports from testing conducted by Defendants upon their lethal injection drugs establishes that *both* of the two distinct batches of lethal injection drugs that Defendants had on hand on the night of March 2 – one mixed and received on February 17, and the other on February 24 – had congealed and were unusable, and that Defendants' problems with defective drugs were not limited to "this batch" alone.

---

[7] Ms. Gissendaner's action was dismissed pursuant to Defendants' Rule 12(b)(6) motion.  Accordingly, none of the submissions that Defendants made in support of their motion were considered by this Court or by the Eleventh Circuit on appeal.  *See Gissendaner v. Bryson*, 803 F.3d at 579 n. 2 (Jordan, J., dissenting).

**A. Two Separate Batches of Defendants' Lethal Injection Drugs Were Defective.**

**1. The Controlled Substance Inventory Log**

In response to an Open Records Act request made on behalf of Mr. Terrell, Defendants have disclosed their Controlled Chemical Inventory Log for their lethal injection drugs, which tracks their receipt and dispensation of the drugs both in advance of the March 2 execution date and in the months following.  Ex. 5.[8]  The log reveals that on February 17, 2015, Defendants received one batch of lethal injection drugs in the form of six syringes of what purported to be compounded pentobarbital.  Ex. 5 at 1.  Per Defendants' log, the drugs were mixed the same day that they were received.  *Id.* These drugs were presumably obtained for Ms. Gissendaner's execution, as she was the only prisoner with an execution date at that time.

On February 24 – one day prior to Ms. Gissendaner's original execution date of February 25 – Defendants received another batch of six syringes, which had also been mixed on the same day that they were received.  *Id.*  That evening, Ms. Gissendaner's execution was postponed until March 2.  Defendants' reason for

---

[8] Exhibits 5, 7, 19, and 20 to this complaint are excerpted from Defendants' voluminous response of November 24, 2015, to an Open Records Act request filed on Mr. Terrell's behalf.  Mr. Terrell does not believe that the authenticity of these documents will be disputed, but he will provide the entirety of the correspondence upon the request of the Court.

obtaining the second batch is unknown.[9] On the night of March 2, however, it was this *February 24th* batch that Defendants took to the execution chamber for Ms. Gissendaner's attempted lethal injection.  *Id.* Defendants have not given a reason for abandoning their February 17 batch unused, but – as discussed *infra* – subsequent disclosures indicate that it, too, had congealed into clumps.

## 2.  The Affidavit of Robert Jones

In Ms. Gissendaner's litigation, Defendants submitted an affidavit from Robert Jones, their former counsel, describing the discovery of the "cloudy" drugs on the night of March 2 and Defendants' efforts to prepare a media response to Ms. Gissendaner's botched execution – an account which corroborates that two separate batches of lethal injection drugs precipitated, and that Defendants still do not know why. Ex. 6.

Mr. Jones attested that after Defendants were alerted that the supply of drugs in the execution chamber was "cloudy," he was dispatched to inspect the "*backup supply* of drugs in the [prison] pharmacy." Ex. 6 at ¶¶2-3 (emphasis added). That supply was similarly corrupted: it contained "small particles or crystals within the solution, which made it appear cloudy." *Id.*[10]

---

[9]Defendants did not obtain an execution warrant for Mr. Terrell until February 27, 2015 – three days after these drugs were mixed and received.

[10] It is unclear from Mr. Jones's affidavit whether the "backup supply" that he checked is the two syringes from the February 24 shipment that were left in the

8

Mr. Jones also provided the only account of the initial stages of Defendants'
self-investigation into the events of that evening.  Per his affidavit, he met with
Defendants' pharmacist at GDCP on March 4 so that the pharmacist could
"inspect[] the drugs and collect[] a sample in order to test the 'ph' [sic] level of the
drugs."  Ex. 6 at ¶7.  Mr. Jones reported that Defendants' pharmacist telephoned
him "[l]ater that afternoon" and "advised that the ph [sic] was within the
appropriate ranges . . . ."  *Id.*  Defendants' pharmacist then asserted that the pH
results "indicated to him that the most likely cause of the precipitation was that the
drugs had been stored at a temperature that was too cold."  *Id.*  Mr. Jones spoke
with Defendants' pharmacist and another anonymous pharmacist on March 6
"about the most likely cause of the observed precipitation within the drugs," and
concluded that "[b]ased on the available information at that time" – which appears
to be nothing more than the pharmacist's representations as to the pH – it
"appeared . . . not [to be] contamination, but storing the drugs at too cold a
temperature, which caused the drugs to precipitate."  *Id.* at ¶8.

Mr. Jones stated that "samples of the drugs" had been shipped to a "testing
laboratory" on March 12, 2015, where they would be tested for the identity of the
active pharmaceutical ingredient (API) and potency only.  *Id.* at ¶9. He then

---

prison pharmacy or the entirety of the February 17 batch.  As discussed *infra*, the
likeliest explanation is both, as the evidence from Defendants' log suggests that all
of the lethal injection drugs in the pharmacy that night were defective.

detailed Defendants' plan to conduct a test that "should *confirm* whether the problem with the drugs that were to be used in the Gissendaner execution was that they were stored at too cold a temperature causing the precipitation within the solution, which is the current prevailing opinion."  *Id.* at ¶10 (emphasis added).

> [T]he supplying pharmacist will be preparing another sample of new execution drugs within the next week. Samples of this new batch of drugs will be sent to an independent testing laboratory for analysis. Another sample of this new batch will be placed in the same refrigerator that stored the drugs that were to be used in the Gissendaner execution and stored at the same temperature, 37 degrees Fahrenheit. Another sample of the drugs will be stored in a newly purchased refrigerator that will maintain a constant temperature of approximately 50 degrees Fahrenheit. These samples will be photographed and closely monitored for seven days.

*Id.* at ¶10.

### 3.  This Testing Reveals Both Batches Were Defective

Defendants also submitted a report by one NMS Laboratories in Willow Grove, Pennsylvania, which documented their receipt of "two samples" of "Pentobarbital Solution" on March 13, 2015, by UPS Next Day Air.  *See* Ex. 7 at 2.  The report describes the first sample as "one clear plastic syringe . . . labeled 'Sod Pentobarbital 50mg/ml Lot *022415*' containing clear pale yellow liquid *with white solid material.*"  *Id.* (emphases added).  The second sample is a "clear plastic syringe . . . labeled 'Sod Pentobarbital 50mg/ml Lot *021715*' containing "clear colorless liquid *with white solid material*."  *Id.* (emphases added).

When read alongside Defendants' log, this report establishes that both the February 17 and February 24 batches of lethal injection drugs were defective. The log records that on March 12, 2015 – the date given by Mr. Jones's affidavit for when the drugs were shipped to a "testing laboratory," Ex. 6 at ¶9 – Defendants removed two syringes of drugs from the prison pharmacy so that they could be sent to the lab for testing: one syringe from the *February 17 batch* and one from the *February 24* batch. Ex. 5 at 1. Given the inclusion of syringes from both batches of drugs in the testing, the assignment of lot numbers to the syringes that correspond with the dates that the two batches were mixed[11], and the fact that the contents of both syringes had precipitated, it seems incontrovertible that both the February 17 and February 24 batches had precipitated by the night of March 2, if not before.

### 4. Defendants' Claim that their Botched Drugs Were an Isolated Mishap is Disproven.

In spite of the fact that these two separate batches of lethal injection drugs were defective, Defendants have repeatedly misrepresented to this Court and others that the precipitation of their lethal injection drugs was a one-time occurrence. A sampling of those claims follows:

---

[11] As noted *supra*, the lot numbers of the samples are evidently their dates of production. Lot Number 021715 would apply to the syringe produced on February 17, 2015, while Lot Number 022415 would apply to the syringe produced on February 24, 2015.

- "Under no less authority than *Baze*, 'an **isolated** mishap alone does not give rise to an Eighth Amendment violation, precisely because such an event, while regrettable, does not suggest cruelty, or that the procedure at issue gives rise to a "substantial risk of serious harm.""" *Gissendaner v. Bryson (Gissendaner II)*, Case No. 1:15-cv-00689 (Doc. No. 9), Defendants' Motion to Dismiss (excerpted hereto as Ex. 8) at 20 (emphasis added) (quoting *Baze*, 553 U.S. at 50 (citation omitted)).

- "The precipitation of **one** set of drugs does not mean that they will precipitate in the future **and** that Defendants will use those drugs." *Gissendaner v. Bryson (Gissendaner II)*, Case No. 1:15-cv-00689 (Doc. No. 34), Defendants' Response in Opposition to Plaintiff's Motion for Reconsideration (excerpted hereto as Ex. 9) at 8 (first emphasis added).[12]

- "But the precipitation does not create a 'substantial change' to the protocol. It is merely **an** event that Appellant is attempting to use to prove the protocol is in violation of the Eighth Amendment." *Gissendaner v. Bryson (Gissendaner II)*, Case No. 15-14335, Brief on Behalf of Appellee (excerpted hereto as Ex. 10) at 25 (emphasis added).

- "In reality, after the inspection revealed **an** irregularity in **the** execution **drug**, officials prudently postponed the execution so that there would *not* be the potential for any 'botched' execution." Ex. 8 at 22 (emphasis added).

- "The State's use of compounded drugs makes incidents like **the one** that transpired at GDC on March 2 all but unavoidable." *Id.* at 30 (emphasis added).

- "Plaintiff obscures her burden by inappropriately ridiculing Defendants' actions when faced with the precipitated pentobarbital **on the night of the scheduled** execution." *Gissendaner v. Bryson (Gissendaner II)*, Case No. 1:15-cv-00689 (Doc. No. 26), Defendant's [sic] Advisory Regarding *Glossip v. Gross* (excerpted hereto as Ex. 12) at 9 (emphasis added).

---

[12] *See also Gissendaner v. Bryson (Gissendaner II)*, Case No. 15-14335, Brief on Behalf of Appellee (excerpted hereto as Ex. 10) at 26; *Gissendaner v. Bryson*, Case No. 15-6336, 15-A336, Respondent's Brief in Opposition to Certiorari Review and Motion for Stay of Execution (attached hereto as Ex. 11) at 8 (emphasis added).

Defendants also asserted that they "were **suddenly** confronted with drugs that did not appear viable for use in an execution they were ordered to perform" and dismissed their misrepresentations as "**initial** confusion as to how to deal with this difficult situation" – a claim that seems dubious if, as seems likely, the purchase of the February 24 batch was motivated by the precipitation of the February 17 batch. *Id.*; *see also* Ex. 11 at 8. Defendants struck a self-righteous note that now rings hollow, arguing that Ms. Gissendaner "misrepresents State officials' **candor** to her counsel regarding concerns over the drug as ineptitude or worse, as **deceit** . . . ."[13] Ex. 8 at 21 (emphases added); *see also* Ex. 11 at 16.

Defendants' assertions are in keeping with their previous attempts to minimize any concerns that this Court might have about the safety and efficacy of their secret drugs.  Defendants have insisted that the FDA-approved pentobarbital that they formerly used and the compounded "pentobarbital" they now obtain "are the *exact* same . . . ."  *Gissendaner v. Bryson ("Gissendaner I")*, Case No. 1:15-cv-523, Transcript of Motions Hearing of 02/24/2015 (attached as "Ex. 13") at 17. Indeed, in another action before this Court that challenged Defendants' use of compounded pentobarbital, Defendants mocked the notion that compounding drugs posed any risks:

---

[13]This is a difficult assertion to credit if Defendants were indeed confronted with one batch of drugs that had gone bad and responded by ordering a second batch from the same pharmacist.

> So you are saying that they can't take pentobarbital, which is described as a pretty easy process, you take a liquid and you take a dry powder and you put them together. I mean, *this isn't difficult, it isn't something difficult to compound . . . .*

*Wellons v. Owens*, Case No. 1:14-CV-1827-WBH, Transcript of Motions Hearing, of 06/16/2014 (attached as "Ex. 14") at 30 (emphasis added).

In *Gissendaner I*, moreover, Defendants offered an assessment of the consequences that would befall them if their representations to this Court proved inaccurate – consequences that their current behavior suggests they intend to avoid:

> [I]f we do not obtain pentobarbital that's properly compounded . . . . the minute that we do run afoul and we do something like that then we *will no longer be able to carry out any of our lawful death sentences.*

Ex. 13 at 25 (emphasis added).[14]

---

[14] Defendants have previously attempted to insulate themselves from scrutiny or responsibility with authority for "a presumption of legitimacy accorded to the Government's official conduct." *See, e.g*., Ex. 8 at 31 (quoting *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 174 (2004)). That presumption is not warranted here. As the adjoining sentences qualifying that presumption note, it is "perhaps . . . less a rule of evidence than a general working principle" that can be displaced with "applicable, clear evidence" such as that before this Court. Indeed, as outlined above, it has never been clearer that the "baseline assurances" Defendants have previously proffered to this Court are "*little more than hollow invocations of 'trust us.'*" *Owens v. Hill,* 758 S.E.2d 794, 807, (Ga. 2014) (Benham, J., dissenting) (emphasis added).

14

**B. Defendants Still Do Not Know Why Their Drugs Congealed**

Defendants' submissions establish that, in addition to misrepresenting the scope of their problems with the mixing of their drugs, Defendants still have no answers for why their drugs were defective.

### 1. The Affidavit of Dr. Zastre

As part of Defendants' self-investigation, Mr. Jones and the Office of the Attorney General contacted Jason Zastre, Ph.D., an associate professor of pharmacy at the University of Georgia, "to provide assistance to the State of Georgia in evaluating what occurred in a sample of compounded pentobarbital sodium solution which apparently precipitated *after shipment on frozen gel packs and storage at approximately 37 degrees Fahrenheit over more than 7 days*." Ex. 15 at ¶3 (emphasis added).  Dr. Zastre recommended that Defendants send samples of both the precipitated solution and the powder from which it had been prepared to a testing laboratory for comparison.  *Id.* at ¶4.  That testing was evidently initiated on March 24 and completed on April 2, 2015.[15]

Upon reviewing the test results, Dr. Zastre attested that "the solid particles remaining in the solution were two different solid forms of pentobarbital," *id.* at

---

[15]The first affidavit of William King, Chief of Special Projects for Defendants' Office of Investigations and Compliance Criminal Investigations Division, indicates that he obtained and shipped these materials on March 24 – the same day that he initiated Defendants' previously undisclosed cold-storage testing. Ex. 16.

¶8, which either "precipitated or fell out of solution," *ibid.* at ¶9.[16] Dr. Zastre

offered two possible explanations for why Defendants' drugs had become unsafe.

The first, which he considered "most likely," was "that the solution was shipped

and stored at a temperature which was too low." *Id.* at ¶11. But he also noted an

additional explanation: "the pharmaceutical solvent used to dissolve the

pentobarbital sodium had absorbed some amount of water or evaporated during the

preparation process." *Id.* (emphasis added).[17]

Dr. Zastre's affidavit clearly identifies *two* possible explanations for why

Ms. Gissendaner's drugs precipitated, but only one was put forward by

Defendants.  On April 16 – the same day Defendants filed their motion to dismiss

in Ms. Gissendaner's § 1983 action in district court – they issued a press release

stating that "[t]he most likely cause of this precipitation was that the drugs were

shipped and stored at a temperature, which was too low."  Defendants omitted any

mention of Dr. Zastre's alternative explanation: that the drug had been

manufactured improperly.

---

[16]As discussed *infra*, the fact that two different forms of pentobarbital were
revealed by this testing suggests to Mr. Terrell's expert that Defendants'
pharmacist used the wrong active pharmaceutical ingredient in mixing Defendants'
lethal injection drugs.

[17] Dr. Zastre made no reference to the testing results that call Defendants'
"cold storage" theory into question, which, as detailed *infra*, were completed two
weeks *before* he signed his affidavit.

### D.  Mr. King's Affidavit and Report

Eight days later, after facing pressure from the media to disclose the cold-storage testing announced in Mr. Jones's affidavit,[18] Defendants filed a supplement to their motion to dismiss which included a second affidavit and investigative report from William King, the Chief of Special Projects for Defendants' Office of Investigations and Compliance Criminal Investigations Division.  Ex. 17 at 2, ¶1.  Mr. King's affidavit detailed a series of tests that he conducted from March 24 through April 2 that roughly parallel those described in Mr. Jones's March 19 affidavit.  Per Mr. King, Mr. Jones contacted him on March 24, 2015, and requested his "assistance" in documenting "the condition of two newly prepared samples of pentobarbital, which would be stored at different temperatures" at the Georgia Diagnostic and Classification Prison.  *Id.* at 2, ¶¶ 2-3.  One sample was stored "at room temperature" while another "was stored at a colder temperature, in a refrigerator located in the same room which was used to store the pentobarbital which was prepared for the execution of Inmate Gissendaner." *Id.* Mr. King

---

[18] *See* Chris McDaniel, *Georgia won't release results of experiment to determine why execution drug had pieces floating in it,* BUZZFEED NEWS (May 26, 2015), available at http://www.buzzfeed.com/chrismcdaniel/georgia-wont-release-results-of-experiment-to-determine-why#.vsx0Xrb0R (last visited December 3, 2015); *see also* Rhonda Cook, *Georgia yet to turn over results of execution drug testing*, ATLANTA JOURNAL-CONSTITUTION (May 27, 2015), available at http://www.ajc.com/news/news/local/georgia-yet-to-turn-over-results-of-execution-drug/nmPdx/ (last visited December 3, 2015).

attested that he "photographed each sample, logged the date and time the photograph was taken, the temperature of each sample, and the condition of each sample once daily on March 24-27, 2015 and March 30-April 3, 2015" – a total of nine days measured over an eleven-day period.[19] *Id.*  Mr. King maintained a log in which he noted "[t]he room temperature and the temperature on the inside of the small refrigerator" which indicated that the temperature of the room in which the unrefrigerated drugs were stored ranged from 67º F to 72º F, while every measure of the temperature of the refrigerator in which the "R" sample was stored was 34º F.  *Id.* at 9-10.

Mr. King concluded his report with this sentence: "*No changes* were noted to either sample during the inspection periods." *Id.* at 5.  A review of Mr. King's log confirms that he described each sample as "clear" for each of the days he observed them.  *Id.* at 9-10.   Defendants have conducted no additional testing to determine why their lethal injection drugs became defective.

## 2.  The Cause of the Drugs' Defectiveness Remains Unknown

When Defendants initiated their self-investigation, all that was known about the drugs that they intended to use to execute Ms. Gissendaner on March 2 was that they were "cloudy" and, per Defendants' own doctor and pharmacist,

---

[19] March 28-29 was the Easter holiday.

18

inappropriate for medical use.  And nine months later, little more is known.

Defendants' preferred "cold-storage" explanation for their defective drugs has been

refuted by their own investigations. Defendants cannot say why their drugs were

defective, and they have wielded Georgia's lethal injection secrecy act to prevent

anyone else from inquiring.

### C. The Cloudiness of Defendants' Two Batches Drugs Establishes Substantial Risks of Constitutional Dimension

While no one knows why Defendants' drugs were defective, every potential

explanation implicates Mr. Terrell's Eighth Amendment rights. Mr. Terrell has

consulted with Dr. Michael Jay, a professor of pharmaceutical sciences and

biomedical engineering at the University of North Carolina-Chapel Hill, who

explains in his attached affidavit that "compounding pharmacies may produce

unpredictable, unregulated, and potentially unsafe drugs." Affidavit of Michael Jay

("Ex. 18") ("Jay Aff.") at 2.[20]  Producing "sterile drugs for intravenous

---

[20]The simple truth about any drug is that unless you know how it was made
– where, and from what, and by whom – you cannot know what it is. To receive
FDA approval, injectable drugs must be sterile and meet other stringent
requirements for quality, purity, and stability.  Jay Aff. at 2. "That is not the case
for all compounding pharmacies." *Id.* Compounding pharmacies "are not subject to
the regulatory procedures, rigorous checks, and drug approval process that is
required under federal Good Manufacturing Practice (GMP). Federal law does not
require non-traditional compounding pharmacies to demonstrate that their products
are safe, effective, pure, or potent. They are not required to comply with federal
manufacturing guidelines or oversight." *Id.* Dr. Jay notes that the "FDA does not
approve non-traditionally compounded drugs for *any* purpose." *Id.* (emphasis
supplied).

administration is one of the most difficult and complex pharmaceutical manufacturing processes," and every "step presents an opportunity for a mistake, such as introducing dangerous cross-contaminants or microbiological contaminants, particulate matter, and/or changing the properties of a solution, e.g., pH, tonicity, etc." Jay Aff at 3. "The potential for product contamination in compounded drugs is significantly higher than the potential for contamination in manufactured pharmaceuticals." Jay Aff. at 3.  Non-FDA-regulated compounding pharmacies such as the one used by the Defendants "produce injectable drugs in circumstances that create a significant risk that the drugs will be so sub-standard that they will cause pain and suffering after injection." Jay Aff. at 7.

The fact that Georgia's lethal injection drugs were cloudy "indicates that the drugs were manufactured or handled improperly." Jay Aff. at 5.  The only explanation for this defectiveness is "critical errors in the procedure by which the compounded drug was produced, transported, stored, and/or handled." Jay Aff. at 7. "In other words, there were issues with the product, personnel, procedures, or all three." Jay Aff. at 7.

According to Dr. Jay, the "cold-storage testing conducted by the Department of Corrections demonstrated that storage temperature was not a factor in the precipitation." Jay Aff. at 5.  Dr. Jay proposed two likely explanations for the precipitation: (a) the pharmacy used the wrong active ingredient – pentobarbital,

not pentobarbital *sodium* – to prepare the drugs, or (b) the pharmacist failed to adjust the pH solution correctly. Jay Aff. at 6.

### 1. Explanation 1: The Compounding Pharmacy Used the Wrong  Active Ingredient.

As Dr. Jay explained, there is a good possibility that the compounding pharmacy used the *wrong* active pharmaceutical ingredient ("API") when preparing the February 17 and February 24 batches of lethal-injection drugs. The proper API for mixing an injectable pentobarbital solution is "pentobarbital *sodium*" – and not, as discussed *infra*, "pentobarbital." Jay Aff. at 6.  Following the events of March 2, however, Defendants' pharmacist provided a powder sample to TriClinic Labs for testing, which revealed that the sample was *not* pure pentobarbital sodium. Jay Aff. at 6. As Dr. Jay explains in his declaration, if the Defendants' compounding pharmacist attempted to mix an injectable pentobarbital solution with an API of pentobarbital – a substance with low water-solubility that is more difficult to keep in solution – instead of pentobarbital sodium, which is much more readily-soluble, that error could have caused the solution to congeal into the crystalline clumps seen in Defendants' video of the drugs. Jay Aff. at 6.

### 2. Explanation 2: The pH Level was Incorrect.

Per Dr. Jay, another likely explanation for the defectiveness of Defendants' February 17 and 24 batches of drugs is an incorrect pH level. Jay Aff. at 6. When a solution is exposed to contaminants or compounded improperly, it "can induce a

21

change in the pH of the formulation, causing the API to fall out of solution and crystallize." Jay Aff. at 6.  A faulty pH poses at least two distinct and substantial risks to a prisoner.  Were the pH to cause the solution to precipitate, the injection of a solution containing particulate matter would cause excruciating pain.  Jay Aff. at 7. Particulate matter can lodge itself in small blood vessels following injection. Jay Aff. at 7. The particulate could also become lodged in the person's lungs, which would be excruciatingly painful. Jay Aff. at 7. The precipitation into particulate matter could also reduce the drug's potency -- in which case it might not kill the person, or it would kill him much more slowly and painfully. Jay Aff. at 7.

Further, a drug formulation's pH "must be carefully adjusted and maintained in order to ensure that the person who is being injected does not suffer pain immediately upon administration." Jay Aff. at 7.  If the pH of the drug product was higher or lower than . . . if properly manufactured, *it would cause intense, burning pain upon injection*." Jay Aff. at 7 (emphasis supplied).

Accordingly, the presence of precipitate in the February 17 and 24 batches of Defendants' lethal injection drugs was both a problem and the symptom of a problem.  The precipitate itself presents a substantial risk of significant pain and suffering, and it also reflects an underlying issue with the drug (contamination,

improper pH level, or the wrong chemical) that presents additional,

unconstitutional risks.

### 3.  The Problem Might Not Be Detected.

Further, the next batch of Defendants' drugs would not necessarily announce

its defectiveness as unmistakably as the February 17 and 24 batches did by the

night of March 2.  Indeed, there exists a very real possibility that the precipitate in

the drugs would not be detectable to the naked eye, and that Defendants would fail

to notice that something was amiss before injecting Mr. Terrell with the aberrant

solution. Per Dr. Jay, "a compounded formulation could have a dangerous pH level

or be polluted with contaminants, but would not display any outward

manifestations of its internal flaws." Jay Aff. at 8; *see also Gissendaner*, 803 F.3d

at 579 (Jordan, J., dissenting) (there is "no guarantee that a doctor or pharmacist

will recognize the problem the next time, particularly if the compounded

pentobarbital has an incorrect pH or is, despite its adulteration, only slightly

cloudy.")  In other words, the drug would not appear cloudy, but it would be "just

as dangerous as a drug whose erroneousness was visible and obvious." Jay Aff. at

8.  Were the particulate matter too small for an observer to see, it would

nonetheless be akin to being injected with "very small *pieces of glass*," which

would "cause significant pain and injury when injected."  Jay Aff. at 8 (emphasis

supplied).  By the time any of these eventualities came to pass, of course, it would be too late for this Court – or any court – to remedy the violation.

### 4.  The Problem is Likely to Recur.

"It is certainly fair to infer that if there is a problem with the supply of defective compounded pentobarbital (which Georgia's doctor and pharmacist agreed was 'not appropriate for medical use') and Georgia has not been able to figure out what caused that problem, the problem is likely to recur." *Gissendaner*, 803 F.3d at 579 (Jordan, J., dissenting). Defendants' pharmacist has supplied defective compounded pentobarbital on at least two occasions. Given that the Defendants have failed to identify the reason that their lethal injection drugs fell out of solution but have changed nothing about how they obtain or handle them, it is only a matter of time before the drugs become defective again. Yet Defendants have provided no assurances. Quite the contrary: they have adhered to a theory of why their drugs precipitated – storage temperature – that was disproved by their own investigation. Given this recalcitrance – indeed, indifference – the use of any compounded drug from this pharmacy for Mr. Terrell's execution clearly implicates his constitutional rights.

### D. Disparities in Recent Executions Suggest Faulty Mixing of Defendants' Compounded Drugs.

Defendants' recent executions of Kelly Renee Gissendaner and Marcus Ray Johnson further highlight the risks posed by Defendants' current lethal injection

drugs and procedure. The execution logs received by Mr. Terrell's counsel on

November 27, 2015, pursuant to an Open Records Act request reveal that Mr.

Johnson took *seven times longer to die* than Ms. Gissendaner. *See* Kelly

Gissendaner Execution Timeline ("Ex. 19"); Marcus Ray Johnson Execution

Timeline ("Ex. 20").  Mr. Terrell has consulted with Dr. Joel Zivot, an

anesthesiologist, who considers that outcome highly unusual and suspicious –

indeed, the *opposite* of what one would expect, given Ms. Gissendaner's

significantly greater weight.  Affidavit of Dr. Joel Zivot ("Ex. 21").  "Variability

such as this is outside of the science of pharmacology and physiology and cannot

be dismissed out of hand." Ex. 21 at 3. Assuming the lethal injection drugs used on

both prisoners were a standard concentration and quality,[21] Ms. Gissendaner's

execution should have lasted longer than Mr. Johnson's. Yet Mr. Johnson took

twenty-one minutes to die, where Ms. Gissendaner's actual execution was finished

in three minutes.[22]  Dr. Jay was also struck by this result, and posited one reason

for the disparity: "a lower concentration of pentobarbital in the solution

_____

[21] This is not necessarily a safe assumption, given the dearth of information about the process by which the drugs are compounded, the ingredients used in the compounding, the equipment used to compound, or the training of the personnel who compound the drugs.

[22] Counsel has measured the length of the execution from the time that the *final* injection is complete to the time that the physicians leave for the execution chamber once the prisoner's vital signs have ended.

administered to Mr. Johnson," suggesting that "the manufacture of these drugs is faulty." Jay Aff. at 8  Dr. Zivot concurred, suggesting that the disparity could be explained by the fact that Mr. Johnson received a different concentration, a lower dose, or a degraded formulation of pentobarbital. Zivot Aff. at 3-4.

Further, a witness to Mr. Johnson's execution observed that his eyes remained open throughout the execution.  Affidavit of Al Lawler ("Ex. 22").  Dr. Zivot concluded that "[t]he fact that Mr. Johnson's eyes remained open is highly unusual . . . . It is a concerning and noteworthy finding."  Ex. 21 at 4.

### E. Defendants' Secrecy Act

Defendants' most critical tool in escaping accountability for the debacle of their defective drugs of February 17 and 24 has been Georgia's lethal injection secrecy act.  In July 2013, O.C.G.A. § 42-5-36 – a provision that previously governed "[c]onfidential information *supplied by inmates*" – was amended to classify all "identifying information" about a "person or entity who participates in or administers the execution of a death sentence . . . [or] that *manufactures, supplies, compounds, or prescribes the drugs*, medical supplies, or medical equipment" used in an execution as a "confidential state secret" not subject to disclosure through Georgia's Open Records Act or "*judicial process*."  O.C.G.A. § 42-5-36 (d) (emphases added).  Defendants have wielded this act aggressively to prevent any attempt to discern whether their lethal injection practices comport with

the Constitution.  *Wellons v. Comm'r, Ga. Dep't of Corr.*, 754 F.3d 1260, 1267

(11th Cir.); see also *ibid.* 1267-68 (Wilson, J., concurring) ("I write separately to

highlight the disturbing circularity problem created by Georgia's secrecy law

regarding methods of execution . . . . [H]ow could [a prisoner make out an Eighth

Amendment claim] when the state has passed a law prohibiting him from learning

about the compound it plans to use to execute him?")

**CAUSES OF ACTION**

**I.   Defendants' Current Source of Compounded Drugs Renders Their
      Lethal Injection Procedures Violative of The Eighth Amendment.**

The Eighth Amendment's prohibition against cruel and unusual punishment

forbids methods of execution that present "a substantial risk of significant harm."

U.S. Const. Amend. VIII; *Glossip v. Gross*, —— U.S. ——, 135 S. Ct. 2726, 2737

(2015); *Baze v. Rees*, 553 U.S. 35, 50-52 (2008) (plurality opinion); *see also in re

Kemmler*, 136 U.S. 436, 447 (1890) ("Punishments are cruel when they involve

torture or a lingering death").  Where an Eighth Amendment cruel and unusual

punishment claim alleges the risk of future harm, "the conditions presenting the

risk must be '*sure or very likely* to cause serious illness and needless suffering,'

and give rise to 'sufficiently *imminent* dangers.'" *Baze,* 553 U.S. at 50 (quoting

*Helling v. McKinney,* 509 U.S. 25, 33, 34–35 (1993)); *see also Glossip*, 135 S. Ct.

at 2737.  "In the lethal injection context, this standard requires an inmate to show

an objectively intolerable risk of harm that prevents prison officials from pleading

that they were subjectively blameless for purposes of the Eighth Amendment."
*Glossip*, 135 S. Ct. at 2737 (quoting *Baze*, 553 U.S., at 50). The controlling
opinion also stated that prisoners "cannot successfully challenge a State's method
of execution merely by showing a slightly or marginally safer alternative." *Baze*,
553 U.S. at 51.  Instead, prisoners must identify an alternative that is "feasible,
readily implemented, and in fact significantly reduce[s] a substantial risk of severe
pain." *Id.* at 52.  "A stay of execution may not be granted" pursuant to a method-
of-execution challenge "unless the condemned prisoner establishes that the State's
lethal injection protocol creates a demonstrated risk of severe pain. [And] [h]e
must show that the risk is substantial when compared to the known and available
alternatives." *Glossip*, 135 S. Ct. at 2737 (quoting *Baze*, 553 U.S. at 61).  A
plaintiff must also show that the risk of severe pain is "substantial when compared
to the known and available alternatives." *Baze,* 553 U.S. at 61, 128 S. Ct. 1520.
Mr. Terrell can make each of these showings.

    As detailed in this complaint and its supporting materials, Defendants' own
records establish that two distinct batches of drugs from the same pharmacist who
will mix the drugs for Mr. Terrell's execution on Tuesday were defective. This
reveals a comprehensive problem with how their drugs are mixed, as opposed to
the easily-remedied, fluky occurrence to which they have attributed the events of

March 2.[23]  Further, Defendants have not figured out what that problem *is* and,

accordingly, have done nothing to fix it.  The risk to Mr. Terrell is objectively

intolerable, as his experts have detailed that every explanation for the defectiveness

that manifested in Defendants' February 17 and 24 batches would cause him

serious illness and needless suffering, but that the defectiveness would not

necessarily announce itself to Defendants as it did on March 2.  Nor can

Defendants be considered blameless for this risk, as they have now routinely

courted *and* concealed it from Mr. Terrell and the Courts – and, unless this Court

intervenes, will do so again on Tuesday night.  None of Mr. Terrell's allegations is

based in speculation.  Defendants continue to obtain their lethal injection drugs

from a pharmacist whose unconstitutional error rate is – according to their own

documentation – around fifty percent. As to alternatives, it would be reasonable to

obtain drugs from a compounding pharmacist who does not have such a history of

mixing defective drugs – particularly given the evidence that the two executions

carried out with his drugs suggest that the properties of the substances that he

mixes vary greatly from one batch to another.  Defendants' refusal to do so

manifests a "deliberate indifference" to the substantial risk of significant harm

---

[23] If so, then Defendants' counsel's representation to Ms. Gissendaner's counsel that "*this* batch just didn't come out like it was supposed to," Ex. 2 at ¶7 (emphasis supplied), is called into serious doubt; it would instead be accurate to say that two distinct batches of the drug, produced an entire week apart, failed to "come out like [they] were supposed to."

posed by their lethal injection practices that the Constitution should not abide.

*Minneci v. Pollard*, 132 S. Ct. 617, 625 (2012).

## II. The Eighth Amendment Entitles Mr. Terrell to the Information Necessary to Determine if Georgia's Method of Execution is Cruel and Unusual.

Mr. Terrell further submits that the Constitution can no longer permit

Georgia to hide behind its secrecy act and conceal every aspect of the manner in

which they conduct executions, given their two instances of defective drugs.

"Georgia can certainly choose, as a matter of state law, to keep much of its

execution protocol secret, but it cannot hide behind that veil of secrecy once

something has gone demonstrably wrong with the compounded pentobarbital it has

procured." *Gissendaner*, 803 F.3d at 579 (Jordan, J., dissenting) (citing *Wellons*,

754 F.3d at 1267–68 (11th Cir. 2014) (Wilson, J., concurring) (noting the

"disturbing circularity problem created by Georgia's secrecy law regarding

methods of execution . . ." as prisoners cannot demonstrate an Eighth Amendment

violation because "the state has passed a law prohibiting [them] from learning

about the compound it plans to use to execute [them]").

A bedrock principle of our rule of law is that "where there is a legal right,

there is also a legal remedy by suit or action at law, whenever that right is

invaded." *See Marbury v. Madison*, 5 U.S. 137, 163 (1803); *see also General Oil

Co. v. Crain*, 209 U.S. 211, 221-30 (1908) (holding that a state court must provide

a remedy for a constitutional violation). With a right such as the Eighth

Amendment, which can only be enforced prospectively, the Supreme Court has not

hesitated to recognize a due process right to the information necessary to determine

whether a violation is risked.  In *Ford v. Wainwright*, 477 U.S. 399, 417-18 (1986),

the Supreme Court held that the Eighth Amendment's prohibition against the

execution of the insane entitled Mr. Ford to adequate procedures for determining

his sanity.  Noting that "[t]he fundamental requisite of due process of law is the

opportunity to be heard," the Court faulted the Florida procedure for "its failure to

include the prisoner in the truth-seeking process" in favor of an assessment

conducted entirely by the executive branch.  *Ford*, 477 U.S. at 413.[24]  The Court

wrote:

> [C]onsistent with the heightened concern for fairness and accuracy
> that has characterized our review of the process requisite to the taking
> of a human life, we believe that any procedure that *precludes the
> prisoner or his counsel from presenting material* relevant to his
> [Eighth Amendment claim] or *bars consideration of that material by
> the factfinder* is necessarily inadequate. The minimum assurance that
> the life-and-death guess will be a truly informed guess requires
> respect for the basic ingredient of due process, namely, *an opportunity
> to be allowed to substantiate a claim before it is rejected.*

*Id.* at 414 (1986) (internal quotations omitted). Accordingly, the Court wrote:

> [T]he lodestar of any effort to devise a procedure must be the
> overriding dual imperative of providing redress for those with
> substantial claims and of encouraging accuracy in the factfinding

---

[24] Florida's practice did not permit any material relevant to the ultimate
decision to be submitted on behalf of the prisoner facing execution. *Id.*

31

determination. The stakes are high, and the "evidence" will always be
imprecise. It is all the more important that the adversary presentation
of relevant information be as unrestricted as possible.

*Id.* at 417.

Similarly, in *Morgan v. Illinois*, the Supreme Court held that a criminal

defendant's Sixth Amendment right to an impartial jury and "the requirement of

impartiality embodied in the Due Process Clause of the Fourteenth Amendment" in

tandem entitled the defendant to information about whether potential jurors would

automatically vote for a death sentence in every capital case, and required that the

trial court afford him adequate process to conduct *voir dire* and make challenges

for cause. *Morgan v. Illinois*, 504 U.S. 719, 728-29 (1992) ("the Sixth *and*

Fourteenth Amendments . . . ensure the impartiality of any jury that will undertake

capital sentencing").  As the Court noted, "[w]ere *voir dire* not available to lay

bare the foundation of petitioner's challenge for cause against those prospective

jurors who would always impose death following conviction, his right not to be

tried by such jurors would be rendered as *nugatory*."  *Id.* at 733 (emphasis added).

Further, in *Brady v. Maryland*, 373 U.S. 83, 86 (1963), the Supreme Court

held that due process requires the government to disclose evidence which "would

tend to exculpate [the defendant] or reduce the penalty."  The underlying principles

of *Brady*, which recognize that the government cannot withhold information

bearing upon the rights of a person whom they wish to deprive of life or liberty, apply with equal force here.

Similarly, Georgia cannot execute Mr. Terrell without first affording him due process of law.  See U.S. Const. Amend. V (1791) ("No person shall … be deprived of *life*, liberty, or property, without due process of law…"); U.S. Const. Amend. XIV (1868) ("nor shall any State deprive any person of *life*, liberty, or property, without due process of law"); *see also Adams v. United States ex rel. McCan*, 317 U.S. 269, 276 (1942) ("procedural devices rooted in experience were written into the Bill of Rights not as abstract rubrics in an elegant code but in order to assure fairness and justice before any person could be deprived of 'life, liberty, or property.'")  "Due process, unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances." *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976) (quoting *Cafeteria Workers v. McElroy*, 367 U.S. 886, 895 (1961)). Rather, "due process is flexible and calls for such procedural protections as the particular situation demands." *Id.* (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)).  It is clear, however, that due process entitles a person whose constitutional rights might be affected by state actions to, at minimum, both notice of those actions and an opportunity to be heard "*at a meaningful time and in a meaningful manner.*"  *Fuentes v. Shevin*, 407 U.S. 67, 80

33

(1972) (emphasis added) ("Parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified.")

The Eleventh Circuit has previously held that a death-sentenced prisoner does not have "the *broad* right 'to know where, how, and by whom the lethal injection drugs will be manufactured' . . . ." *Wellons*, 754 F.3d at 1267 (11th Cir. 2014) (emphasis added).  But that holding addressed a scenario in which the prisoner presented a range of potential risks inherent to the use of compounded drugs.  Here, we are dealing not in potentialities, or even in risk.  Rather, we must face the reality that Defendants' drugs were twice defective in a way that indisputably would have caused "serious illness and suffering" upon injection. Were the underlying problem to recur – which, again, is likely, as Defendants do not know its cause and thus can adopt no meaningful safeguards against it – it would not necessarily manifest in a way detectable to the naked eye.

"[T]hings changed, and they changed in a material way" on the night of March 2, 2015.  *Gissendaner,* 803 F.3d at 579 (Jordan, J. dissenting). Those events cast the Defendants' lethal injection procedures and protocol in a new light and require its reevaluation. Given that, Mr. Terrell respectfully submits that "[i]t is not asking too much to require Georgia to put on some evidence that will provide some level of confidence that its compounded pentobarbital is no longer a problem." *Id*. Until Defendants do so, Mr. Terrell's execution must not proceed.

## CONCLUSION

For the reasons detailed in his complaint and this memorandum of law, Mr.

Terrell respectfully seeks injunctive and equitable relief.

This, the 6th day of December, 2015.

Respectfully submitted,

*/s/ Gerald King*
Gerald W. King, Jr. (Ga. Bar No. 140981)
FEDERAL DEFENDER PROGRAM, INC.
101 Marietta Street, Suite 1500
Atlanta, Georgia 30303
404-688-7530
(fax) 404-688-0768
Gerald_King@fd.org

Susan C. Casey (Ga. Bar. No. 115665)
965 Virginia Avenue, NE
Atlanta, Georgia  30306
404-242-5195
(fax) 404-879-0005
susancasey@outlook.com

COUNSEL FOR MR. TERRELL

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have served a copy of the foregoing pleading upon Respondent by email to:

        Sabrina Graham
        Beth Burton
        Senior Assistant Attorney General
        Office of Attorney General
        132 State Judicial Building
        40 Capitol Square, S.W.
        Atlanta, Georgia 30334

Dated, this the 6th day of December, 2015.

        /s/ Gerald W. King