IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| BRIAN KEITH TERRELL,                )<br>                                                          )<br>     Plaintiff,                            )<br>                                                          )<br>v.                                                    )<br>                                                          )<br>                                                          )<br>HOMER BRYSON, Commissioner,  )<br>     Georgia Department of Corrections;  )<br>                                                          )<br>                                                          )<br>BRUCE CHATMAN, Warden,           )<br>     Georgia Diagnostic and Classification )<br>     Prison;                                        )<br>                                                          )<br>OTHER UNKNOWN EMPLOYEES    )<br>AND AGENTS,                                 )<br>                                                          )<br>     Georgia Department of Corrections,  )<br>                                                          )<br>     Defendants.                              )<br>                                                          )<br>_____ ) | Civil Action<br>No. 1:15-CV-04236 (TCB)<br><br>EXECUTION SCHEDULED<br>**Tonight, December 8, 2015,**<br>**7:00 P.M.** |

**PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS**

**A. Defendants Admit that Two Batches Precipitated, but Do Not Say When, or Why They Needed Two**

Defendants make a critical concession in their motion. Defendants admit for

the first time that not one but *two* separate batches of the lethal injection drugs

1

mixed by their pharmacist congealed into crystals sometime in February and March of 2015.  Doc. No. 8 at 25-26 (noting "precipitation of one set of drugs, albeit two batches which were prepared within days of each other in the same method and stored in the same method").  As noted in Mr. Terrell's principal brief, that acknowledgment contradicts their previous representations to this Court.  Doc. No. 3-1 at 11-14.

Defendants also scrupulously avoid disclosing both *when* their February 17 batch of lethal injection drugs precipitated, and *why* they obtained another batch on February 24– critical facts for assessing the "deliberate indifference" of their conduct.  Defendants concede that they obtained both the February 17 and 24 batches of their drugs for Ms. Gissendaner.  Doc. No. 8 at 13. They note that they obtained the latter batch the day before Ms. Gissendaner's scheduled execution date of February 25, which they assert was postponed on February 24 because of an inclement weather alert.  Doc. No. 8 at 14.  But they do not explain why they needed a replacement batch.  The February 17 batch would not have expired until March 17 – more than two weeks after Ms. Gissendaner's rescheduled execution date of March 2, and, indeed, well after her warrant window closed.  Doc. No. 3-5

at 1.[1]  Why obtain a second batch, at what was surely significant cost, unless there was something wrong with the first?

### B. Defendants' Pharmacist Botches His Drugs "Only" Twenty Percent of the Time[2]

Defendants also make an objection that operates as a concession.  They disclose -- for the first time, to Mr. Terrell's knowledge -- that the pharmacist who mixed the defective batches of lethal injection drugs in February also mixed the batches used to execute Marcus Wellons, Wayne Holsey, Andrew Brannan, and

---

[1]Defendants argue that the information showing that "both batches [of their lethal injection drugs had] precipitated was in the possession of [Ms.] Gissendaner," and that "Counsel for Plaintiff provides no explanation as to why this could not have been presented in the Gissendaner case." Doc. No. 8 at 15.  As the late Ms. Gissendaner is not a party to this litigation, it is difficult to understand what relevance this has.  Keeping that aside, however, Plaintiff notes that Defendants did not disclose that information until *after* Ms. Gissendaner had moved for reconsideration in the district court. The district court granted Defendants' Motion to Dismiss on August 10, 2015, and Ms. Gissendaner submitted her Motion for Reconsideration on September 8, 2015. *See Gissendaner v. Bryson ("Gissendaner II")*, Case No. 1:15-cv-689 (Doc. 31). On September 8, 2015, Defendants released the log to Ms. Gissendaner via the U.S. Postal Service, and Ms. Gissendaner's counsel received the disclosure sometime later.

[2]Defendants mistakenly assert that "Plaintiff alleges that Defendants[sic] choice of using compounded pentobarbital subjects him to an intolerable risk of pain."  Doc. 8 at 10.  Plaintiff is not asserting that lethal injection using *any* compounded pentobarbital subjects him to a substantial risk of serious harm. Plaintiff's allegation is much narrower - - the use of compounded pentobarbital prepared by a pharmacist who has improperly compounded the drug 22% of the time creates a substantial risk of serious harm.

Warren Hill, as well as Kelly Gissendaner and Marcus Ray Johnson.[3] The point of Defendants' response appears to be that their pharmacist's unconstitutional error rate is not 50%, but *only* 22.23%. Plaintiff respectfully submits that any method of execution that fails one out of every five attempts cannot pass muster under the Eighth Amendment.

### C. Defendants' Observation Log Does Not Safeguard Against Defective Drugs

Defendants argue that Plaintiff must show that 1) their drugs will be defective, and 2) that they will use those defective drugs. Defendants argue that Plaintiff can make neither showing because they now observe their drugs hourly on the day of the execution. Doc. No. 8-2.[4] The uncontroverted evidence before this Court, however, is that the defects in the means or method by which Defendants' pharmacist mixes these drugs would not always manifest themselves in a readily visible way. Jay Aff. at 8 ("a compounded formulation could have a dangerous pH level or be polluted with contaminants, but would not display any outward

---

[3]As Georgia's lethal injection secrecy act makes the identifying information of this pharmacist a confidential state secret, both Plaintiff and this Court will have to take Defendants' word on this claim.

[4]It is unclear what relevance Defendants see in their disclosure of their observation logs to "a media outlet." Doc. No. 8, n. 12.

manifestations of its internal flaws"); *see also Gissendaner II*, 803 F.3d at 579 (Jordan, J., dissenting) (there is "no guarantee that a doctor or pharmacist will recognize the problem the next time, particularly if the compounded pentobarbital has an incorrect pH or is, despite its adulteration, only slightly cloudy.")[5]  For that reason, the fact that the drugs mixed for the executions of Ms. Gissendaner on September 30 and Mr. Johnson on November 19 did not become observably cloudy is far from "*definitive proof* that Defendants have ascertained what caused the precipitation and have kept it from reoccurring."  Doc. No. 8 at 12.  As Plaintiff has argued, the disparity in their execution times is further evidence of variability in the batch-to-batch potency or efficacy of the drug, which raises serious constitutional concerns.[6]

### D. Defendants' Cold-Storage Theory Has No Evidentiary Support

---

[5] Mr. Terrell has not asserted that Defendants would not notice precipitation as extreme as what occurred by the night of March 2, *see* Video of Precipitated Lethal Injection Drug ("Ex. 4").  Precipitation to that degree would be literally impossible to ignore.

[6] Defendants assert that Plaintiff has erred in calculating that Mr. Johnson's execution took seven times longer than Ms. Gissendaner's, arguing that it took only "4.75 times . . . longer."  Doc. No. 8 at 22.  Mr. Terrell submits that this disparity would be troubling enough, but it is Defendants' math that is faulty.  Counting, as Defendants note, "from the minute of the injection of the last syringe until the minute officials leave to determine if the condemned has in fact died," Mr. Johnson's execution log shows twenty-one minutes elapsing.  Doc. No. 19.  Ms. Gissendaner's shows three.  Doc. No. 20.

Further, the fact remains that Defendants' only proffered explanation for why two batches of their pharmacist's drugs congealed has been disproven by their own testing. Dr. Jay has attested that the "cold-storage testing conducted by the Department of Corrections demonstrated that storage temperature was not a factor in the precipitation." Jay Aff. at 5. Defendants have not controverted that evidence save to assert that Dr. Zastre explained away the failure of their testing to fit their theory by informing them that pentobarbital does not precipitate every time it is stored too cold – although his affidavit does not say that or include any acknowledgment whatsoever of Defendants' testing. Doc. No. 8 at 21.

Defendants also suggest that Plaintiff must show that past executions were unconstitutional in order to prevail in this action. Doc. No. 8 at 24. That is not the standard. The question is whether Defendants' use of drugs mixed by the same pharmacist who provided them with these defective drugs presents a substantial risk of significant harm to Mr. Terrell. For the reasons detailed in his principal brief, it does. Doc. No. 3-1 at 27-30. Similarly, for the reasons detailed in his brief, neither Mr. Terrell nor his experts are speculating in observing that the defective batches mixed by Defendants' pharmacist indicate that they are being improperly made, stored, or handled in a way that risks "serious illness or needless suffering." Every possible explanation for their defectiveness would cause precisely that. Doc. No. 3-1 at 19-24.

6

### E. A "Known and Available Alternative" is Another Pharmacist

Defendants overlook that Plaintiff has indeed pleaded "a known and available alternative method of execution," as required by *Glossip v. Gross*, ––– U.S. ––––, 135 S. Ct. 2726, 2737 (2015). Plaintiff has proposed the reasonable alternative that Defendants "obtain drugs from a compounding pharmacist who does not have such a history of mixing defective drugs . . . ." Doc. No. 3 at 29-30. As Defendants note that "MILLIONS OF AMERICANS" obtain compounded drugs, surely this pharmacist cannot be Defendants' only available source for lethal injection drugs. Doc. No. 8 at 26 (emphasis in original). And these many Americans referenced would surely find it reasonable – if not essential – to find another pharmacist if the drugs that they used for "therapeutic purposes" shared the twenty-percent error rate that Defendants admit to for their lethal injection drugs. Doc. No. 8 at 26.

### F. Defendants Do Not Deserve this Court's Good Faith

Defendants again assert that they are entitled to a presumption of good faith. Their misrepresentations to this Court are enough to establish that they are not. But these are not Defendants' only transgressions. Defendants have previously run afoul of the Drug Enforcement Administration by illegally importing sodium

thiopental.[7] However, the thiopental had already been used in the executions of Brandon Rhode and Emanuel Hammond, both of whom appeared to remain conscious throughout their executions.[8] Defendants changed their protocol to feature pentobarbital despite the fact that its sole FDA-approved manufacturer warned them that the drug was not safe for use in judicial lethal injections – and an

---

[7]When the FDA placed an administrative hold upon a shipment of imported sodium thiopental that Georgia and several other states had ordered through a U.S. pharmacy, Defendants opted to circumvent federal law governing the importation of controlled substances by directly purchasing a supply of mislabeled sodium thiopental for use in lethal injections from Dream Pharma, Inc., a fly-by-night pharmaceutical wholesaler/distributor which operated out of a storefront driving school in London, England. Defendants chose this course despite the fact that they were not registered with the Drug Enforcement Agency (DEA) as an importer of non-narcotic controlled substances and did not provide a declaration of importation to the DEA. On March 16, 2011, after the Attorney General of the United States was notified of Georgia's illegal importation, the DEA seized Georgia's entire supply of thiopental. Bill Rankin et al., *DEA seizes Georgia's supply of lethal injection drug*, ATLANTA JOURNAL-CONSTITUTION (March 16, 2011), available at http://www.ajc.com/news/news/local/dea-seizes-georgias-supply-of-lethal-injection-dru/nQrdf/ (last visited Feb. 19, 2015).

[8]On September 27, 2010, Georgia used its illegally-imported thiopental in its execution of Brandon Rhode. Mr. Rhode's eyes remained open throughout his execution, which strongly suggested that he was conscious after the administration of thiopental. On January 25, 2011, Georgia executed Emanuel Hammond with the same batch of thiopental; Mr. Hammond opened his eyes and grimaced after the injection of the thiopental, suggesting that he was inadequately sedated. Liliana Segura, *the Executioner's Dilemma*, THE NATION (May 12, 2011), available at http://www.thenation. com/article/160648/executioners-dilemma# (last visited Feb. 19, 2015).

execution spectacle followed.[9]  Defendants once changed their protocol on the very eve of an execution because their drugs had expired some two weeks earlier.[10]

---

[9] Sten Stovall, *Lundbeck "Horrified" at Drug Execution Use*, WALL STREET JOURNAL (June 8, 2011), Available at: http://online.wsj.com/article/ SB10001424052702304259304576373020954841208.html (last visited Feb. 19, 2015).  Defendants ignored the drug manufacturer's caution and, on June 23, 2011, executed Roy Blankenship pursuant to their new protocol. An AP reporter who witnessed the execution offered the following account of Mr. Blankenship's reaction:

> As the injection began, [Blankenship] jerked his head toward his left arm and made a startled face while blinking rapidly.  He soon lurched to his right arm, lunging with his mouth agape twice.  He then held his head up, and his chin smacked as he mouthed words that were inaudible to observers . . . . His eyes never closed.

Greg Bluestein, *Ga. Executes inmate convicted of Savannah slaying*, THE ATLANTA JOURNAL-CONSTITUTION (June 23, 2011); *see also* Eddie Ledbetter, *Making a date with death*, STATESBORO HERALD (June 25, 2011) ("Blankenship was apparently much more aware of his surroundings at a time when he shouldn't have been").

[10] Defendants hastily adopted a new, one-drug lethal injection protocol at approximately noon on July 17, 2012 – the day before the scheduled execution of Warren Hill.  Rhonda Cook and Bill Rankin, *State changes lethal injection protocol, reschedules execution*, ATLANTA JOURNAL-CONSTITUTION (July 17, 2012), available at: http://www.ajc.com/news/news/local/state-changes-lethal-injection-protocol-reschedule/nQXJc/ (last visited Feb. 19, 2015).  While Defendants offered no explanation for this eleventh-hour change, later reports revealed that Georgia's supply of pancuronium bromide – the second drug administered pursuant to its now-abandoned three-drug protocol – had expired on July 1, 2012, some two weeks before Mr. Hill's scheduled execution.  Rhonda Cook, *Expired drugs led to cancellation of execution by lethal injection*, ATLANTA JOURNAL-CONSTITUTION (Aug. 2, 2012), available at: http://www.ajc.com/news/news/local/expired-drugs-led-to-cancellation-of-execution-by-/nQXhn/ (last visited Feb. 19, 2015).

9

Defendants also scheduled two executions within a single week because of their mistaken belief that their drugs were about to expire.[11]  Further, it appears that Defendants have illegally obtained the compounded pentobarbital that they have used or intended to use in the executions they have scheduled since July 2013 by paying an unidentified doctor $5,000 to write a fraudulent prescription "for" the condemned prisoner authorizing the compounding of the drugs for their execution. Ex. 1 at 42-60.[12]  Defendants' short- and long-term history prohibit extending them the benefit of the doubt.

---

[11] Following litigation over whether state law prohibited Georgia from changing its protocol without complying with the notice-and-comment procedures of its Administrative Procedures Act, Defendants promptly scheduled two executions: Warren Hill for February 19, 2013, and Andrew Cook on February 21, 2013.  Defendants' decision to schedule Mr. Hill and Mr. Cook's executions within days of each other was based upon their mistaken belief that their supply of pentobarbital expired on March 1, 2013; it actually expired on March 31.  Ed Pilkington, *Georgia rushes through executions before lethal injection drugs expire*, THE GUARDIAN (February 21, 2013) ("Georgia confirmed to the Guardian that its entire supply of pentobarbital expires on 1 March"), available at: http://www.guardian.co.uk/world/2013/feb/21/georgia-executions-lethal-injection-drug-pentobarbital (last visited March 7, 2015). While Mr. Hill's execution was stayed, Mr. Cook was executed pursuant to the novel protocol.

[12] Mr. Terrell bases this conclusion upon Defendants' ORA responses in July 10, 2013, which reveal the agreements Defendants entered into with an unknown compounding pharmacy and doctor in order to procure pentobarbital for the execution of Mr. Hill, which was then scheduled for July 15, 2013.  *See* Letter from Wilson to Painter of 07/10/2013 (attached as "Ex. 6") at 000005-000039.

**G. This Action is not Time-Barred**

Plaintiff's claims stem from the precipitation of two batches of Defendants' lethal injection drugs between February 17, 2015, and March 2, 2015, and the disparity in executions carried out in September and November. As noted by the authority Defendants cite, a "method of execution claim accrues on the later of the date in which state review is complete, or the date on which the capital litigant becomes subject to a new or substantially changed protocol." *Wellons v. Comm'r, Ga. Dep't of Corr.*, 754 F.3d 1260, 1263, 1264 (11th Cir. 2014). The question of whether a significant change has occurred is a fact-dependent inquiry that cannot be resolved without considering the "specific factual allegations and/or evidence presented" in each case. *Arthur v. Thomas*, 674 F.3d 1257, 1260 (11th Cir. 2012).

> Simply because no court, based on the allegations and evidence that has been presented in cases to date, has found a significant change does not mean that such evidence does not exist. To read our circuit decisions . . . as holding—no matter what new facts allege or new evidence reveals—that . . . substitutions of pentobarbital for sodium thiopental is not a significant change in . . . execution protocols is to ignore the reality that scientific and medical evidence that exists today may differ from that which new scientific and medical discoveries and research reveal tomorrow.

*Id.* (emphasis added). Defendants' reliance upon *Gissendaner I* as precluding a finding of a "substantial change" is unavailing. Doc. No. 8 at 10. As Judge Jordan noted in dissent in *Gissendaner II*, while the *Gissendaner I* panel had found her previous challenge untimely, "just hours after we issued our ruling, things

11

changed, and they changed *in a material way*." *GissendanerII*, 803 F.3d at 576 (Jordan, J., dissenting) (emphasis added). Defendants' disclosures have further evidenced these substantial changes, revealing that Defendants' problems with their lethal injection drugs were broader than Defendants represented and have yet to be solved. In light of the facts that Defendants themselves concede about their pharmacist, the notion that Plaintiff could be precluded from challenging Defendants' protocol as twelve years late would be unconscionable.

### H. Neither *Wellons* nor *Gissendaner I* and *II* Foreclose this Action

Defendants argue that Plaintiff's constitutional arguments are precluded by *Wellons v. Comm'r, Ga. Dep't of Corr.*, 754 F.3d 1260, 1267 (11th Cir. 2014). But Defendants ignore the distinction that Plaintiff has made between the facts before this Court in *Wellons* and now. Mr. Terrell does not claim a "*broad* right 'to know where how, and by whom the lethal injection drugs will be manufactured.'" Rather, he asserts that, as Judge Jordan wrote, while "Georgia can certainly choose, as a matter of state law, to keep much of its execution protocol secret . . . it cannot hide behind that veil of secrecy once something has gone demonstrably wrong with the compounded pentobarbital it has procured." *Gissendaner II*, 803 F.3d at 579 (Jordan, J., dissenting).

Similarly, this Court's resolution of *Gissendaner II* was informed by none of Defendants' disclosures, which establishes that the scope of Defendants' problems with their lethal injection drugs was much broader than they represented to this Court, and before the disparity manifest in Ms. Gissendaner and Mr. Johnson's executions had even occurred. In light of the fact that the abundant and damning evidence of Defendants' deliberate indifference detailed in this action has never been considered by *any* Court, these prior adjudications cannot foreclose this Court's review and grant of relief.

This, the 8th day of December, 2015.

Respectfully submitted,

*/s/ Gerald King*
Gerald W. King, Jr. (Ga. Bar No. 140981)
FEDERAL DEFENDER PROGRAM, INC.
101 Marietta Street, Suite 1500
Atlanta, Georgia 30303
404-688-7530
(fax) 404-688-0768
Gerald_King@fd.org

Susan C. Casey (Ga. Bar. No. 115665)
965 Virginia Avenue, NE
Atlanta, Georgia  30306
404-242-5195
(fax) 404-879-0005
susancasey@outlook.com

COUNSEL FOR MR. TERRELL

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing pleading upon Respondent by email to:

>Sabrina Graham
>Beth Burton
>Senior Assistant Attorney General
>Office of Attorney General
>132 State Judicial Building
>40 Capitol Square, S.W.
>Atlanta, Georgia 30334

Dated, this the 6th day of December, 2015.

/s/ Gerald W. King