FILED IN CLERK'S OFFICE
U.S.D.C. - Newnan

DEC 08 2015

James N. Hatten, Clerk
By: Deputy Clerk

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

BRIAN KEITH TERRELL,

      Plaintiff,

v.

HOMER BRYSON, Commissioner,
Georgia Department of
Corrections; BRUCE CHATMAN,
Warden, Georgia Diagnostic and
Classification Prison; and OTHER
UNKNOWN EMPLOYEES AND
AGENTS, Georgia Department of
Corrections,

      Defendants.

CIVIL ACTION FILE

NUMBER 1:15-cv-4236-TCB

## **O R D E R**

Plaintiff Brian Keith Terrell is a Georgia death row inmate who is

scheduled to be executed by lethal injection at 7:00 tonight. On

December 6, he filed this action pursuant to 42 U.S.C. § 1983.[1]

---

[1] Section 1983 creates a cause of action against any person who violates
another's constitutional rights while acting under the color of state law. Challenges
to the constitutionality of execution procedures are appropriately brought pursuant
to § 1983. *McNair v. Allen*, 515 F.3d 1168, 1176 (11th Cir. 2008).

Presently before the Court is Terrell's motion for temporary restraining order and stay of execution [3].

## I.   Background

### A.   Terrell's Conviction, Appeals, and Habeas Petitions

In 1992, John Watson, a seventy-year-old man who was a good friend of Terrell's mother, discovered that Terrell had forged $9,000 in checks from his account. Watson informed Terrell's mother of the forgeries and told her that he would not press charges if Terrell returned most of the money within about two days. On the second day, Watson's body was found on his property. He had been shot four times and severely beaten in the face and head. *See Terrell v. State*, 523 S.E.2d 294, 296 (Ga. 1999) ("*Terrell I*").

Terrell was tried three times on charges arising from Watson's death. In 1994, his first trial ended with a hung jury. At his second trial, he was convicted of malice murder and ten counts of forgery, but the Georgia Supreme Court reversed and ordered a new trial. *Id.* In 2001, Terrell was retried, convicted, and sentenced to death. The Supreme Court of Georgia affirmed and subsequently denied Terrell's

2

motion for reconsideration. *Terrell v. State*, 572 S.E.2d 595 (Ga. 2002) ("*Terrell II*"). On October 6, 2003, the United States Supreme Court denied Terrell's petition for a writ of certiorari. *Terrell v. Georgia*, 540 U.S. 835 (2003).

Terrell then filed a state habeas corpus petition, which was granted as to the penalty of death,[2] but on appeal the Georgia Supreme Court reversed and reinstated Terrell's death sentence. *Hall v. Terrell*, 679 S.E.2d 17 (Ga. 2009). In July 2009, Terrell filed a petition for a writ of habeas corpus in this Court pursuant to 28 U.S.C. § 2254. The petition was denied in May 2011, and in March 2014 the Eleventh Circuit affirmed. *Terrell v. GDCP Warden*, 744 F.3d 1255, 1258 (11th Cir. 2014) ("*Terrell III*"). *En banc* review was denied in May 2014, and in December of that year, the United States Supreme Court denied certiorari. *Terrell v. Chatman*, 135 S. Ct. 726 (2014).

---

[2] The court found that trial counsel had provided ineffective assistance by, among other things, failing to (1) consult and present evidence from an independent forensic pathologist rebutting the State's evidence as to the manner of the victim's death; (2) adequately cross-examine the State's medical examiner; and (3) challenge the statutory aggravating circumstance of armed robbery. *Hall*, 679 S.E.2d at 20-23.

## B.    Background to Georgia's Lethal Injection Protocol

Pursuant to the lethal injection protocols of the Georgia

Department of Corrections ("GDC"), Defendants plan to administer five

grams of compounded pentobarbital to induce death in Terrell. Because

this action challenges the constitutionality of that plan, it is necessary

to understand the recent history of Georgia's lethal-injection

procedures, which the undersigned has previously summarized as

follows:

> Most of the states that have the death penalty initially
> relied on a three-drug cocktail to induce death in the
> condemned. Sometime in 2010, states, including Georgia,
> began facing a shortage of one of the three drugs, sodium
> thiopental, because the company that manufactured the
> drug quit making it. Various misadventures followed as the
> [GDC] tried to procure the drug from other sources. At one
> point, federal agents seized the state's entire supply of the
> drug. [In May 2011,[3] GDC] officials then changed their
> protocol, substituting pentobarbital for sodium thiopental. In
> July 2011, the company that manufactured pentobarbital
> announced that it would henceforth "deny orders from
> prisons located in states currently active in carrying out
> death sentences" and prohibit the redistribution of
> pentobarbital without its authorization.
>
> The [GDC] then adopted a new, one-drug lethal
> injection protocol in July 2012, under which it would use

---

[3] *See DeYoung v. Owens*, 646 F.3d 1319, 1323 (11th Cir. 2011).

4

> only pentobarbital. In March of 2013, the Georgia
> Legislature adopted the lethal injection secrecy act[,]
> O.C.G.A. § 42-5-36(d), pursuant to which all "identifying
> information" about a "person or entity who participates in or
> administers the execution of a death sentence . . . [or] that
> manufactures, supplies, compounds, or prescribes the drugs,
> medical supplies, or medical equipment" used in an
> execution [is] a "confidential state secret" not subject to
> disclosure through Georgia's Open Records Act or "judicial
> process." "Identifying information" includes "professional
> qualifications."

Order denying motion for temporary restraining order and granting

motion to dismiss, *Wellons v. Owens*, No. 1:14-cv-1827-WBH , Doc. 10

(N.D. Ga. June 16, 2014) ("*Wellons I*") (footnote added, internal citations

omitted).

## C.   Terrell's First Scheduled Execution

In February 2015, the Superior Court of Newton County directed

that Terrell be executed between March 10 and March 17. The GDC

initially scheduled his execution for March 10. But the execution did not

take place as planned.

On March 2, just eight days before Terrell's initial execution date,

another inmate on Georgia's death row, Kelly Renee Gissendaner, was

scheduled to be executed by lethal injection. Late that evening, but

before Gissendaner was escorted to the execution chamber,
Gissendaner's lawyers received a phone call informing them that her
execution would not proceed because the pentobarbital on hand
appeared cloudy and was unusable. The State's attorneys called back a
short time later to inform Gissendaner's lawyers that there was another
batch of the drug—prepared one week apart from the cloudy batch—
available and that it was possible that the execution might go forward
that evening after all. But after consulting with a doctor and a
pharmacist about the suitability of the drugs on hand, the State notified
Gissendaner's lawyers that the execution definitely would not take
place that night. The next day, Defendants announced that
Gissendaner's and Terrell's executions would be postponed indefinitely
"while an analysis is conducted of the drugs planned for use" in the
executions. [3-2].

### D.   Details Regarding the Cloudy Pentobarbital

In the months since the March 2 incident, additional details have
come to light through Gissendaner's litigation in this Court,
*Gissendaner v. Bryson*, No. 1:15-cv-689-TWT (N.D. Ga. filed Mar. 9,

6

2015), and through requests submitted by Terrell to Defendants
pursuant to Georgia's Open Records Act.

In response to Terrell's open records request, Defendants disclosed
a chemical log tracking their receipt and dispensation of pentobarbital
[3-5]. That log reflects that between February 17 and March 2, 2015,
Defendants received three shipments of pentobarbital syringes. The
first shipment, received by the GDC on February 17, was of syringes
that had been mixed that same day. The second and third shipments,
received on February 24 and March 2, respectively, contained
pentobarbital that was mixed on February 24.

In connection with Gissendaner's litigation challenging Georgia's
lethal-injection protocol, Robert Jones—the then-general counsel of the
GDC—submitted an affidavit describing the circumstances surrounding
the March 2 incident:

> On the evening of Monday, March 2, 2015, I was at the
> Georgia Diagnostic and Classification Prison in Jackson,
> Georgia, awaiting decisions from the courts about the
> pending execution of Inmate Gissendaner. At approximately
> 9:20 p.m., I was notified by a member of the execution team
> that there was a concern about the appearance of the drugs
> which were to be used in the execution. I immediately

7

contacted the pharmacist who prepared the drugs and then inspected the backup supply of drugs in the pharmacy. . . .

The drugs appeared to have precipitated and contained small particles or crystals within the solution, which made it appear cloudy. The Deputy Warden advised that the primary supply of drugs, which were in the execution chamber, were in the same condition. . . .

I went to the execution chamber to inspect the drugs in that location. These drugs . . . were in essentially the same condition, containing small particles or crystals within the solution. . . .

On Wednesday, March 4, 2015, I met the pharmacist who prepared the execution drugs . . . . The pharmacist inspected the drugs and collected a sample in order to test the "ph" level of the drugs. Later that afternoon, the pharmacist advised that the ph was within the appropriate ranges, which indicated to him that the most likely cause of the precipitation was that the drugs had been stored at a temperature that was too cold. The drugs had been stored at the facility at a temperature of approximately 37 degrees Fahrenheit.

On Friday, March 6, 2015, I participated in a conference call with the pharmacist who prepared the drugs and another consulting pharmacist about the most likely cause of the observed precipitation within the drugs. Based on the available information at the time, it appeared that the most likely cause of this issue was not contamination, but instead storing the drugs at too cold a temperature, which caused the drugs to precipitate.

[3-6], ¶¶ 2-4, 7-8.

Defendants conducted testing to confirm the cause of the precipitation in the pentobarbital. *Id.*, ¶¶ 9-10. Defendants contacted Dr. Jason Zastre, a professor at the University of Georgia School of Pharmacy, for assistance in evaluating what had gone wrong. [3-15]. On Zastre's recommendation, Defendants sent a sample of the solution and the powder used to prepare the solution to a testing facility in Indiana known as Triclinic Labs. The samples were analyzed and tested, and it was determined, at least according to Zastre's affidavit relied upon by the GDC in Gissendaner's lawsuit, that "the solid particles remaining in the solution were two different solid forms of pentobarbital." [3-15], ¶ 8.

Zastre's affidavit identifies two possible causes for the precipitation observed in the drugs on March 2:

> [T]he most likely cause of the precipitation observed within the solution was that the solution was shipped and stored at a temperature which was too low. An additional possible cause could be if the pharmaceutical solvent used to dissolve the pentobarbital sodium had absorbed some amount of water or evaporated during the preparation process. This may result in a lower concentration of solvent, ultimately impacting the solubility of the drug, which increases the possibility of precipitation.

*Id.*, ¶ 11.

9

The GDC also conducted its own testing to determine whether storing the pentobarbital at too cool a temperature caused the precipitation. [3-6], ¶ 10. GDC employee William King assisted the GDC in documenting this testing and submitted an affidavit in Gissendaner's litigation. [3-17]. King explains that his role "was to document the condition of two newly prepared samples of pentobarbital, which would be stored at different temperatures." [3-17], ¶ 3. Between March 24 and April 3—with the exception of the weekend of March 28-29, when the samples were not monitored—King "photographed each sample, logged the date and time the photograph was taken, the temperature of each sample, and the condition of each sample once daily." *Id.* King's log from the testing period reflects that "[n]o changes were noted to either sample during the inspection periods," and King described each sample as "clear" on each entry in the log. *Id.*, pp.5, 9.

Defendants have adopted the cold-storage theory referenced in Zastre's affidavit, and they therefore take the position that the precipitation observed on March 2 was the result of an isolated occurrence. They have paid little heed to the alternative explanation

10

offered by Zastre, and they explain away the results of their own testing, as documented in King's log, by suggesting that pentobarbital does not precipitate *every* time it is stored too cold. According to Terrell, however, Defendants' position ignores the "incontrovertible" evidence that both the February 17 and February 24 batches of the lethal-injection drugs were defective. Indeed, Terrell suggests that it is "likely" that the GDC was prompted to order the February 24 batch precisely because the February 17 batch had already precipitated.

### E.   The Instant Action and Motion

In August 2015, Gissendaner's § 1983 lawsuit was dismissed, and Defendants resumed executions with the same source(s) of drugs and pursuant to the same protocol as they had used in and before March 2015. On September 30, Gissendaner was executed, and on November 19, another death-row inmate named Marcus Ray Johnson was executed. On November 23, the Superior Court of Newton County ordered that Terrell be executed between December 8 and December 15. Defendants have scheduled the execution for today, December 8.

11

After his death warrant was issued, Terrell filed an informal grievance with the GDC, and then a formal one, both of which were denied. On December 3, 2015, he filed an action in the Superior Court of Fulton County. *Terrell v. Bryson*, No. 2015CV268795 (Fulton Super. filed Dec. 3, 2015). Then on December 6, he instituted this action and filed the motion now under advisement. On December 7, the Fulton County complaint was dismissed at Terrell's request.

Terrell asserts two causes of action. First, he characterizes the two defective batches of pentobarbital as pointing to a systemic problem with the manner in which Defendants' sources mix their lethal-injection drugs. He contends that this problem, coupled with the facts that Defendants have not identified or attempted to remedy the cause of the defect and that the defect might not manifest itself as it did on March 2, presents an objectively intolerable risk of serious harm to Terrell if his execution is carried out as planned.

In his second cause of action, Terrell seeks information about Defendants' confidential execution protocol. He argues that in the face of evidence of at least two defective batches of lethal-injection drugs, the

12

State cannot hide behind its veil of secrecy and deny him the

information necessary to determine whether (and if necessary, prove

that) his impending execution poses the risk of an Eighth Amendment

violation. *See generally Wellons v. Comm'r, Ga. Dep't of Corr.*, 754 F.3d

1260, 1267-68 (11th Cir. 2014) ("*Wellons II*") (Wilson, J. concurring)

(questioning how a prisoner could ever show a substantial risk or

objectively intolerable risk of harm "when the state has passed a law

prohibiting him from learning about the compound it plans to use to

execute him" and describing this situation as creating a "disturbing

circularity problem").

### F.   Terrell's Experts and the Likelihood of Continuing Problems with Defendants' Lethal-Injection Drugs

In support of his legal arguments and motion for injunctive relief,

Terrell relies in part on the declaration of Dr. Michael Jay, the

chairman of the Division of Molecular Pharmaceutics at the University

of North Carolina at Chapel Hill's Eshelman School of Pharmacy [3-18].

Jay explains that the GDC obtains its lethal-injection drugs from what

is known as a "compounding pharmacy," i.e., a pharmacy that doesn't

merely dispense mass-produced drugs but actually mixes and combines

ingredients to create pharmaceutical products. According to Jay, compounding pharmacies—some of which operate completely outside the FDA's regulatory framework—"may produce unpredictable, unregulated, and potentially unsafe drugs" and "produce injectable drugs in circumstances that create a significant risk that the drugs will be so sub-standard that they will cause pain and suffering after injection." [3-18], pp.3, 7.

Jay reviewed the documents filed by the State in connection with Gissendaner's litigation, as well as some of the documents produced by the State in response to Terrell's Open Records Act request. To Jay, "[t]he cloudiness of Georgia's lethal injection drugs reveals that there were critical errors in the procedure by which the compounded drug was produced, transported, stored, and/or handled." *Id.*, p.7. Jay quickly discounts the cold-storage theory, explaining in his affidavit that "the cold-storage testing conducted by the Department of Corrections demonstrated that storage temperature was not a factor in the precipitation of their lethal injection drugs." *Id.*, p.5.

14

Instead, Jay identifies "two likely explanations for why the drugs
precipitated: (1) the pharmacy used the wrong active ingredient
(pentobarbital, not pentobarbital sodium) to prepare their solutions; or
(2) the pharmacist did not adjust the pH of the solution correctly." *Id.*,
p.6. Pentobarbital is only very slightly water-soluble, whereas
pentobarbital sodium is much more soluble; thus, if the pharmacist
used the former substance as the active ingredient in the compounded
pentobarbital, that could explain the appearance of precipitated matter
in the syringes. As to the second theory, the introduction of air or
contaminants can induce a change in the pH of the formulation and
cause the formula to crystallize. Jay explains that Defendants'
procedures do not guard against—and in some cases actively increase
the risk of—the introduction of such contaminants.

Jay explains what would have happened if the cloudy, coagulated
drugs had been administered on March 2, 2015:

> If Ms. Gissendaner or Mr. Terrell had been injected with the
> cloudy lethal injection drugs from March 2, and the
> cloudiness was attributable to particulate matter from
> precipitated API or contaminants, they would have suffered
> immense pain. If an injectible drug contains particulate
> matter—as a result of an inappropriate pH value and/or a

15

contamination—the particulate matter can lodge itself in small blood vessels following injection. The particulate could also become lodged in the person's lungs, which would be extremely painful. Further, the existence of the particulate could reduce the drug's potency, in which case it may not kill the person, or it would kill him much more slowly.

*Id.*, p.7.

But Jay is clear that the unusual appearance of the March 2 drugs is not the only cause for concern. He notes that the GDC's documents reveal that Johnson took longer to die after the injections began than did Gissendaner, despite the fact that Gissendaner was significantly larger than Johnson. *See* [3-20], [3-21]. This disparity, according to Jay, "could reflect a lower concentration of pentobarbital in the solution administered to Mr. Johnson." [3-18], p.8. Terrell has filed the declaration of Dr. Joel Zivot, a board-certified anesthesiologist and professor of anesthesiology at Emory University School of Medicine, who agrees that this disparity is concerning and could suggest degraded or contaminated drugs and/or a failure by Defendants to administer lethal injection drugs that are consistent in formulation and concentration. [3-22], pp.3-4. Jay identifies a "real possibility" that a compounded formulation could have an irregularity—such as a

16

dangerous pH level or the presence of contaminants—that would not be detectable to the  naked eye but might "still cause significant pain and injury when injected." [3-18], p.8.

## II.   Discussion

To obtain the injunctive relief he seeks, Terrell must demonstrate (1) a substantial likelihood of success on the merits of his § 1983 claim; (2) irreparable harm to him if an injunction does not issue; (3) that the threatened injury to him in the absence of an injunction outweighs the harm to Defendants if the injunction is granted; and (4) that the injunction will serve the public interest. *Parker v. State Bd. of Pardons & Paroles*, 275 F.3d 1032, 1034-35 (11th Cir. 2001).

### A.   Substantial Likelihood of Success

The Court concludes that Terrell has not shown a substantial likelihood of prevailing on the merits of his § 1983 claim.

#### 1.   Terrell's Method-of-Execution Claim is Time-Barred

First, Terrell's method-of-execution claim is time-barred. His § 1983 action is subject to Georgia's two-year statute of limitations for personal injury actions. *Wellons II*, 754 F.3d at 1263. A method-of-

execution claim accrues "on the later of the date on which state review is complete, or the date on which the capital litigant becomes subject to a new or substantially change[d] execution protocol." *Id.* Direct review of Terrell's convictions and sentences was completed in October 2003, when the Supreme Court denied certiorari. By law, then, he was required to file any challenge to the method of his execution by October 2005—over ten years ago.

Georgia has used lethal injection as its sole means of execution since 2001. *See Dawson v. State*, 554 S.E.2d 137, 139 (Ga. 2001). Although Georgia changed its lethal-injection protocol in May 2011 to substitute pentobarbital as the anesthetizing agent in lieu of sodium pentothal, the Court concludes this was not a "substantial change" to the execution protocol. *Gissendaner v. Comm'r, Ga. Dep't of Corr.*, 779 F.3d 1275, 1281-82 (11th Cir. 2015) ("*Gissendaner I*") ("The switch from FDA-approved pentobarbital to compounded pentobarbital is not a substantial change because the switch between two forms of the same drug does not alter the method of execution."); *Wellons II*, 754 F.3d at 1263.

18

The facts alleged by Terrell relating to the precipitation observed in two batches of pentobarbital do not bring this case outside the holdings in *Gissendaner* or *Wellons*. The observed precipitation does not create any change to the execution protocol; indeed, once the precipitation was observed, Defendants halted executions and did not administer the precipitated drugs. Terrell has raised a number of arguments about the problems attendant to the use of compounded drugs, but these "are just additional arguments about why the shift from one form of pentobarbital to another is a substantial change." *Gissendaner*, 779 F.3d at 1282. The Eleventh Circuit has already held it was not, and Terrell has failed to present materially different facts that bring this case outside the operation of the circuit court's holding in that regard.

In sum, Terrell's method-of-execution claim accrued in 2003 and was subject to a two-year limitations period. As such, it is time-barred.

### 2.    Terrell Has Not Shown a Likelihood of Prevailing on His Eighth Amendment Claim

Even if Terrell's Eighth Amendment claim were timely, he has not shown that he is likely to prevail on the merits of that claim. The

Eighth Amendment's prohibition against cruel and unusual punishment forbids methods of execution that present "a substantial risk of significant harm." *Glossip v. Gross*, ___ U.S. ___, 135 S. Ct. 2726, 2737 (2015). Where, as here, an Eighth Amendment claim alleges the risk of future harm, "the conditions presenting the risk must be 'sure or very likely to cause serious illness and needless suffering' and give rise to 'sufficiently imminent dangers.'" *Baze v. Rees*, 553 U.S. 35, 50 (2008) (internal punctuation and emphasis omitted) (quoting *Helling v. McKinney*, 509 U.S. 25, 33, 34-35 (1993)).

To prevail on an Eighth Amendment challenge to a method of execution, the prisoner must show "'an objectively intolerable risk of harm' that prevents prison officials from pleading that they were 'subjectively blameless for purposes of the Eighth Amendment.'" *Glossip*, 135 S. Ct. at 2737 (quoting *Baze*, 553 U.S. at 50). He must also show that the risk of harm is "substantial when compared to the known and available alternatives." *Id.* But a prisoner "cannot successfully challenge a State's method of execution merely by showing a slightly or marginally safer alternative." *Baze*, 553 U.S. at 51. Instead, he must

point to an alternative procedure that is "feasible, readily implemented, and in fact significantly reduce[s] a substantial risk of severe pain." *Id.* at 52.

Terrell argues that Defendants' use of compounded pentobarbital, particularly after the events of March 2, subjects him to an intolerable risk of pain. The Eleventh Circuit has previously rejected the argument that "the risks of using a compounded pentobarbital from an undisclosed source . . . poses a substantial threat of undue pain and suffering." *Wellons*, 754 F.3d at 1262. It also rejected Gissendaner's argument that the precipitation of the drugs on March 2 shows an Eighth Amendment violation. *Gissendaner v. Comm'r, Ga. Dep't of Corr.*, 803 F.3d 565, 568 (11th Cir. 2015) ("*Gissendaner III*") ("The allegations Gissendaner has pleaded concerning the events of March 2, 2015, which is the basis of her complaint, do not evidence, much less establish, that she faces a 'substantial risk of serious harm.'"). In fact, the Eleventh Circuit observed that Defendants' decision to halt the execution after observing the precipitated drugs evidenced that

Defendants took affirmative steps to avoid such a risk. *Id.* This same reasoning applies here.

The State conducted four executions before March 2 using pentobarbital, all of which were carried out without incident. It did not attempt to execute anybody using the defective pentobarbital, and Gissendaner and Johnson were executed in September and November of this year, also without incident. Whatever went wrong with the compounded pentobarbital on March 2, Terrell has not shown that as a result of that occurence, he faces an objectively unreasonable risk of serious harm. "[T]he Constitution does not demand the avoidance of all risk of pain in carrying out executions. . . . State efforts to implement capital punishment must certainly comply with the Eighth Amendment, but what that Amendment prohibits is wanton exposure to objectively intolerable risk, not simply the possibility of pain." *Baze*, 553 U.S. at 47, 61-62 (internal punctuation and citation omitted).

Terrell has also failed to point to a more feasible alternative. He argues that Defendants should obtain the drugs "from a compounding pharmacist who does not have such a history of mixing defective drugs,"

22

[3-1], p.29, but he has not shown that the two defective batches of pentobarbital—neither of which was administered to anybody—point to the existence of a such a widespread problem that continued use of the same pharmacist is unreasonable. And the pre- and post-March executions that were carried out without incident using compounded pentobarbital mixed by the same pharmacist suggest that is not the case. Even if the pharmacist at issue was to blame for the two defective batches, it is not clear that switching pharmacists would be anything but "a slightly or marginally safer alternative." *Baze*, 553 U.S. at 51.

Terrell has failed to show a likelihood of prevailing on the merits of his Eighth Amendment claim, even assuming that such a claim were not time-barred.

### 3. Due Process Claim

Terrell argues that the circumstances surrounding the defective March 2 drugs and Defendants' failure to identify or rectify the problem entitle him, under principles of due process, to information regarding the manufacture, compounding, handling, and injection of the drugs that will be used in his execution. The Court disagrees. The Georgia

Supreme Court has held that O.C.G.A. § 42-5-36(d) is constitutional. *Owens v. Hill*, 758 S.E.2d 794, 796 (Ga. 2014). State officials are presumed to act legitimately and properly in the discharge of their duties, and Terrell has failed to rebut that presumption in this case. In the absence of a showing that the statute is unconstitutional, evidence suggesting that Defendants have acted improperly, and evidence tending to show that he will be executed using procedures that expose him to a substantial risk of harm, Terrell has not shown that he is entitled to any more information than he has already been provided.[4]

"Neither the Fifth, Fourteenth, or First Amendments afford [a prisoner] the broad right to know where, how, and by whom the lethal injection drugs will be manufactured, as well as the qualifications of the person or persons who will manufacture the drugs, and who will place the catheters." *Wellons II*, 754 F.3d at 1267 (internal punctuation

---

[4] The Court also rejects Terrell's argument that the apparent disparity in the length of Gissendaner's and Johnson's executions present a substantial risk of harm to Terrell. Even accepting the argument that this disparity points to an inconsistency in the purity or concentration of the compounded pentobarbital, nothing before the Court suggests that the longer execution caused Johnson to suffer severe pain beyond that level of pain associated with any execution. *See Baze*, 553 U.S. at 47, 61-62.

omitted). Moreover, even if Terrell were provided this information, he has failed to show how that would place him in any better position to raise an Eighth Amendment claim. Terrell has not shown that he is likely to prevail on the merits of his due process claim.

## B.   Remaining Factors

On these facts, the Court finds that the first factor relevant to Terrell's request for injunctive relief is all but dispositive, as the remaining factors are either neutral or barely tip in Terrell's favor.

Admittedly, there can be no dispute that Terrell will suffer irreparable harm if the stay of execution is not granted. *Ingram v. Ault*, 50 F.3d 898, 900 (11th Cir. 1995) (inmate facing imminent execution satisfies the requirement of irreparable harm). But that is not to say that the harms the State and the public will suffer if an injunction issues are insignificant. *See Crowe v. Donald*, 528 F.3d 1290, 1292 (11th Cir. 2008) (noting that although "[a] defendant's interest in being free from cruel and unusual punishment is primary[,] . . . the State's interest in effectuating its judgment remains significant" and "[v]ictims

25

of crime also have an important interest in the timely enforcement of a sentence.") (internal punctuation omitted).

Turning to the fourth factor, the public interest is served not only by ensuring that State officials act within the parameters of the law and do not violate the rights of those condemned to die by lethal injection, but also by timely enforcement of sentences. *Id.* Finally, the Court notes that there is "a strong equitable presumption against granting relief where the claim could have been brought at such a time as to allow consideration of the merits without requiring a stay" of the execution. *Hill v. McDonough*, 547 U.S. 573, 574 (2006).

## III.   Conclusion

For the foregoing reasons, Plaintiff's motion for temporary restraining order and stay of execution [3] is denied.

IT IS SO ORDERED this 8th day of December, 2015.

Timothy C. Batten, Sr.
United States District Judge

26